**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

RHONDA MARIE BAILEY,       )
                                      )
                 Plaintiff,     )
                                      )
            v.               )      No.  4:13-CV-1846 CAS
                                      )
CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security,  )
                                      )
               Defendant.   )

**MEMORANDUM AND ORDER**

Plaintiff Rhonda Marie Bailey brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the Commissioner's final decision denying her applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq.  For the reasons that follow, the decision of the Commissioner is reversed.

### I.  Procedural History

On June 1, 2010, the Social Security Administration denied plaintiff's February 2010 applications for DIB and SSI, in which plaintiff claimed she became disabled on July 29, 2009, because of degenerative disc disease with osteoarthritis, shortness of breath – possibly chronic obstructive pulmonary disease (COPD), heart problems, depression, possible diabetes, and possible thyroid problems.  Plaintiff was forty-five years of age when she applied for benefits. At plaintiff's request, hearings were held before an administrative law judge (ALJ) on August 31, 2011, and April 20, 2012, at which plaintiff, a vocational expert, and medical experts testified.  On September 13, 2012, the ALJ denied plaintiff's claims for benefits, finding vocational expert testimony to support a finding that plaintiff could perform work that exists in

significant numbers in the national economy. (Tr. 10-26.) On July 18, 2013, upon review of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-5.) The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

In this action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff argues that the ALJ improperly evaluated the evidence of record regarding her alleged substance abuse, which resulted in an erroneous decision that such alleged abuse was a contributing factor material to a finding of disability. Plaintiff also claims that the ALJ failed to consider evidence of her somatoform pain disorder and thus erred in failing to find this mental impairment to be a severe impairment at Step 2 of the sequential analysis; and, further, that the ALJ erred in failing to consider the effects of this impairment in combination with her other impairments in determining her residual functional capacity (RFC). Plaintiff requests that the decision of the Commissioner be reversed and that the matter be remanded for an award of benefits or for further evaluation.

For the reasons that follow, the ALJ did not err in his factual findings regarding plaintiff's substance abuse. However, because the ALJ failed to properly consider plaintiff's somatoform pain disorder in determining disability, the matter will be remanded for further proceedings.

## II. Evidence Before the ALJ

A. Medical Records Dated March 2009 through August 2011

The medical record in this case begins in March 2009 with plaintiff's visit to the emergency department at Parkland Health Center (Parkland) for treatment of bronchitis and sinusitis. Plaintiff denied any alcohol abuse or drug addiction. (Tr. 422-29.)

Plaintiff visited the Parkland emergency department on July 29, 2009, with complaints of low back pain with numbness in the legs and hands bilaterally. Plaintiff denied any drug or alcohol use. Tenderness and spasm were noted about the paraspinal muscles, and plaintiff was unable to perform straight leg raising or hip motion testing. Plaintiff was noted to be anxious and depressed. An injection of Valium and Demerol was administered. Plaintiff was diagnosed with lumbar radiculopathy and was discharged that same date in stable condition. Plaintiff was prescribed Vicodin, Flexeril, and Medrol upon discharge. (Tr. 414-21.)

On April 6, 2010, plaintiff underwent a consultative physical evaluation for disability determinations. Plaintiff reported to Dr. Musaddeque Ahmad that she had been unable to work since June 2009 because of low back pain, shortness of breath, and chest pain. It was noted that plaintiff was not currently taking any medications. Plaintiff denied any drug or alcohol use. Plaintiff reported feeling anxious and depressed with financial stressors. Physical examination showed tenderness on palpation to the lumbosacral spine but was otherwise normal in all respects. No spasms were noted, and plaintiff had full range of motion about all extremities and joints. No neurological abnormality was noted. X-rays of the lumbar spine showed degenerative joint disease involving the L4-S1 facet joints and asymmetrical sclerosis involving the left lamina and pedicle of L5. Dr. Ahmad diagnosed plaintiff with low back pain; chest pain of unknown cause; dyspnea/ shortness of breath of unknown cause; and mild depression with anxiety, likely secondary to financial stress. Dr. Ahmad opined that plaintiff had no significant limitation in mental ability. As to plaintiff's physical ability, Dr. Ahmad opined that plaintiff could sit for four hours out of an eight-hour workday, stand at least two to three hours out of an eight-hour workday, walk at least half a mile slowly, lift up to forty pounds, and carry up to twenty pounds. (Tr. 435-41, 443.)

On April 13, 2010, plaintiff underwent a consultative psychological evaluation for disability determinations. Plaintiff reported to Lauretta V. Walker, Ph.D., that she felt inadequate and did not like to be around crowds or people. Plaintiff reported having no friends but that she sometimes talked to her neighbor. Plaintiff reported having visited St. Anthony's twice on an outpatient basis and that she was previously prescribed Wellbutrin, BuSpar, and Prozac, which did not help. Plaintiff reported that she has had no insurance for years and no longer takes medication or goes to St. Anthony's because she cannot afford the care. Plaintiff denied any alcohol or drug problems, but reported occasional past use of marijuana. Plaintiff also reported having back problems for a long time, and Dr. Walker observed plaintiff to be uncomfortable and to walk stiffly and uncertainly. Mental status examination showed plaintiff to be oriented in all spheres. Dr. Walker noted plaintiff's speech and thoughts to often be disjointed, and plaintiff was rarely able to put an entire sentence together. Plaintiff was noted to be anxious, depressed, and distraught much of the time. Plaintiff reported sleeping a lot, but she remained tired. Plaintiff reported having thoughts of suicide but no current attempts. Plaintiff reported that she sometimes heard whispers. Dr. Walker determined plaintiff's fund of basic information to be good and that she had at least average intelligence, but that her emotional condition interfered with her being able to "pull things together and be efficient." Dr. Walker diagnosed plaintiff with major depression-severe and assigned a Global Assessment of Functioning (GAF) score of 54.[1] Dr. Walker opined that plaintiff appeared to be very depressed

---

[1] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. Text Revision 2000) (DMS-IV-TR). A GAF score between 51 and 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). Id. In 2013, the American Psychiatric Association released the fifth edition of the DSM (DSM-V), which no longer uses the GAF scale to rate an individual's level of functioning. However, because the DSM-IV-TR was in use when the medical entries were made

with diminished ability to think clearly and follow through with actions. She further opined that plaintiff should be able to understand and follow simple directions but with moderate impairment. Dr. Walker also opined that plaintiff would have moderate to severe problems getting along with others on the job and adapting to changes. (Tr. 445-48.)

Medical records dated April 17, 2010, show that plaintiff was diagnosed at Parkland with lumbosacral strain and was given hydrocodone, ibuprofen, and Flexeril. (Tr. 452-58.)

Chest x-rays taken May 3, 2010, for disability determinations yielded negative results. (Tr. 461.) An echocardiogram performed that same date showed normal sinus rhythm. (Tr. 462.)

On May 24, 2010, Dr. Judy K. Martin, a medical consultant with disability determinations, completed a Psychiatric Review Technique Form in which she opined that plaintiff's major depression caused mild restrictions in activities of daily living and in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. Dr. Martin opined that plaintiff was able to understand, remember, and carry out simple instructions over the course of a normal workweek with customary breaks; retained the ability to get along with coworkers and supervisors; and was able to adapt to changes in a routine work-like setting. (Tr. 463-74.) In a Mental RFC Assessment completed that same date, Dr. Martin opined that, in the domain of Understanding and Memory, plaintiff was moderately limited in her ability to understand and remember detailed instructions but otherwise was not significantly limited. In the domain of Sustained Concentration and Persistence, Dr. Martin opined that plaintiff was markedly limited in her ability to carry out detailed instructions. Dr. Martin further opined that plaintiff was

in this case and at the time the ALJ entered his decision, the DSM-IV-TR remains relevant to the issues raised herein.

moderately limited in her ability to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods, but otherwise was not significantly limited. In the domains of Social Interaction and Adaptation, Dr. Martin opined that plaintiff was moderately limited in her ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting, but otherwise was not significantly limited. (Tr. 475-77.)

On May 28, 2010, Dr. Herbert Waxman, a medical consultant with disability determinations, completed a Physical RFC Assessment wherein he opined that plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand and/or walk a total of at least two hours in an eight-hour workday, and sit a total of about six hours in an eight-hour workday. Dr. Waxman further opined that plaintiff could frequently balance and could occasionally climb, stoop, kneel, crouch, and crawl. Dr. Waxman further opined that plaintiff should avoid concentrated exposure to extreme cold but otherwise had no environmental limitations. Dr. Waxman opined that plaintiff had no manipulative, visual, or communicative limitations. (Tr. 478-83.)

Plaintiff was admitted to the emergency department at Jefferson Regional Medical Center on June 28, 2010, with complaints of a broken finger. Plaintiff's medical history of chronic back pain, degenerative disc disease, and degenerative joint disease was noted. Plaintiff also reported experiencing shortness of breath with walking. Pitting edema was noted about plaintiff's lower legs bilaterally. (Tr. 498-505.) Plaintiff reported being an intravenous "meth user" for a "very long time" and that she had stopped using the drug about six months prior. (Tr. 505.) A splint was placed on the broken finger, and plaintiff was prescribed Ultram for pain. (Tr. 507.)

Plaintiff visited Dr. Tanya M. Quinn at St. Anthony's Neurosurgery Services on April 18, 2011, for evaluation of back pain. Plaintiff reported having back pain for many years and that the pain had worsened in her back and hips over the last several years, leading to an inability to stand or walk for any period of time and an inability to sit for too long. Plaintiff reported that any activity worsened her pain. Plaintiff also reported shortness of breath and some swelling in her legs. Dr. Quinn noted plaintiff's past medical history to also include COPD and depression. Plaintiff's current medications included Albuterol inhaler, Citalopram, Robaxin, Oxybutynin, and Nabumetone.[2] Physical examination showed depressed deep tendon reflexes. No edema was noted. Motor examination showed plaintiff to have full strength throughout all extremities. Dr. Quinn noted imaging studies to show mild degenerative disease most significant at L5-S1 but no severe foraminal stenosis and no canal stenosis. Dr. Quinn recommended that plaintiff proceed with pain management referral for severe back pain and participate in physical therapy for the next four to six weeks. Dr. Quinn reported that no surgical intervention would result in significant relief of plaintiff's symptoms. (Tr. 525-26.)

Upon referral from her disability lawyer and from her doctor, plaintiff visited Resolutions Behavioral Health at the Potosi Rural Health Clinic on May 4, 2011, to see a psychiatrist. Plaintiff reported feeling very depressed relating, in part, to her health. Plaintiff reported being unable to walk and that she had chronic back pain as well as degenerative joint disease and COPD. Plaintiff also reported that her son was suicide-prone. Plaintiff reported having low energy and motivation and that she cries a lot and sleeps most of the time. Plaintiff reported that she isolates herself, hears whispers, and believes those whispering to her are who gave her the pain. Plaintiff reported that she locks herself in the bathroom so those whispering to her will not

---

[2] There is no indication in the record as to when these medications were prescribed for plaintiff or by whom.

get her and replace her body with someone else. Plaintiff reported having difficulty attending to her activities of daily living. Plaintiff reported having nothing to look forward to and feeling hopeless and worthless. She reported having suicidal thoughts at times. Plaintiff reported that she lives with her three cats and has received unemployment benefits for the past two years. Plaintiff denied any alcohol or drug use. Mental status examination showed plaintiff to be cooperative and to have fair eye contact. Psychomotor retardation was noted. Dr. Patrick Oruwari noted plaintiff's speech rate to be normal, and her thought process was logical and goal directed. Plaintiff denied any current suicidal or homicidal ideation, but paranoid ideation was present. Plaintiff's mood and affect were noted to be depressed, and plaintiff was tearful and very emotional. Dr. Oruwari diagnosed plaintiff with recurrent major depressive disorder and pain disorder with psychological and medical factors. A GAF score of 35 was assigned.[3] Dr. Oruwari prescribed Cymbalta and Risperidone and noted that plaintiff needed psychotherapy. (Tr. 528-29.)

Plaintiff visited the Advanced Pain Center on May 6, 2011, with complaints of chronic low back pain with radiation to both legs, and numbness and tingling in her legs and feet. Plaintiff denied any history of drug or alcohol abuse. Physical examination showed moderate to severe tenderness about the entire lumbar spine; normal muscle strength, sensation, and reflexes; normal range of motion; and positive straight leg raising, bilaterally. Severe tenderness was noted about the sacral spine. It was noted that a February 2011 MRI of the lumbar spine showed diffuse bulging disc at L4-5 and moderate degenerative disc disease. Dr. Abdul Naushad diagnosed plaintiff with lumbar discogenic pain, osteoarthritis, lumbar facet

---

[3] A GAF score between 31 and 40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). DSM-IV-TR at 34.

- 8 -

arthropathy/degenerative disc disease/spondylosis, and obesity. Plaintiff was prescribed Gabapentin (Neurontin), hydrocodone-acetaminophen (Vicodin), and Naproxen. Plaintiff was instructed to undergo initial urine drug screening (UDS) that same date, and a lumbar epidural was scheduled. (Tr. 532-36.)

Plaintiff returned to Dr. Naushad on May 20, 2011, and reported that the medication improved her daily functioning and her sleep, but she felt she could not function well without the pain medication. Physical examination showed moderate tenderness about the lumbosacral spine. Plaintiff's initial UDS was noted to be "consistent." Plaintiff was instructed to continue with Vicodin and Naproxen but to discontinue Neurontin because it caused dizziness. It was noted that Medicaid did not cover physical therapy. (Tr. 537-41.)

Plaintiff returned to Dr. Oruwari on June 6, 2011, and reported having panic attacks and having difficulty being around people. It was noted that plaintiff had not yet been scheduled to see a therapist. Plaintiff was not tearful, but she had poor eye contact. Plaintiff's mood and affect were depressed, and plaintiff appeared anxious. Plaintiff was diagnosed with major depressive disorder, pain disorder, and social phobia. A GAF score of 45 was assigned. Dr. Oruwari instructed plaintiff to increase her Cymbalta and to continue with Risperidone. Diazepam (Valium) was also prescribed. (Tr. 530.)

On June 16, 2011, plaintiff visited Dr. Ajmal Sultan at Advanced Pain Center and reported her pain to be tolerable with medication but that she could not function well without it. Physical examination was unchanged. Plaintiff was prescribed Diazepam to take for anxiety before undergoing a pain block injection, which was not yet scheduled. Plaintiff's prescriptions for Naproxen and Vicodin were refilled. (Tr. 542-46.)

Plaintiff visited Dr. Naushad on July 6, 2011, for lumbar epidural steroid injection. (Tr. 547-50.) On July 14, plaintiff reported to Dr. Sultan that the injection did not help much but that

she was willing to try again. Physical examination showed mild to moderate tenderness about the lumbosacral spine with positive straight leg raising bilaterally. Plaintiff was continued on Vicodin and Naproxen, and a second lumbar epidural was scheduled. Plaintiff was advised during this appointment that her UDS from May 6 confirmed the presence of methamphetamine. Plaintiff was given a warning about this result, the narcotic agreement was reviewed, and plaintiff stated that she understood. (Tr. 551-55.)

Urine drug screening dated July 14, 2011, yielded negative results for amphetamine. (Tr. 602.)

Plaintiff returned to Dr. Oruwari on July 27, 2011, and reported that Diazepam helped her somewhat but that she needed to take extra dosages. It was noted that plaintiff was scheduled to see a therapist. Plaintiff reported her unemployment to have run out and that she was no longer receiving any money, which led to fleeting suicidal thoughts. Dr. Oruwari noted plaintiff to be tearful and emotional and to be fearful of being homeless. Plaintiff was diagnosed with major depressive disorder, pain disorder, and social anxiety. Plaintiff was continued in her GAF score of 45. Dr. Oruwari instructed plaintiff to increase her dosage of Diazepam and to continue with Cymbalta and Risperidone. (Tr. 531.)

Plaintiff underwent a second lumbar epidural steroid injection on August 20, 2011. Prescriptions for Vicodin and Naproxen were also refilled. (Tr. 556-59.)

B.      Administrative Hearing Held August 31, 2011

The first of two administrative hearings was held before the ALJ on August 31, 2011, at which testimony from plaintiff was adduced in response to questions posed by the ALJ and counsel.

Plaintiff was forty-seven years of age at the time of the hearing. Plaintiff is divorced and has four children, ages fifteen, twenty-one, twenty-three, and twenty-six years old. Her mother

has custody of her fifteen-year-old daughter. Plaintiff lives alone in an apartment with three cats. Plaintiff graduated from high school and attended college for one semester. (Tr. 98-99.) She stands about five feet tall and weighs 280 pounds. She receives food stamps and began receiving Medicaid assistance in March 2011. (Tr. 100-11.)

Plaintiff testified that she stopped working in June 2009 when her back went out. (Tr. 103, 106.) Plaintiff testified that a significant number of her past jobs were short-term because of transportation problems and difficulty keeping things "lined up," yet she needed to work since she was a single mother. (Tr. 113-14.)

Plaintiff testified that she is not able to currently work because of her inability to stand or walk due to low back pain. Plaintiff testified that she does not walk very far because her back and legs go numb, and she uses a cane and a walker because of her fear of falling. (Tr. 116-17.) She has not had any surgery but receives spinal injections, which have not yet helped her condition. (Tr. 118.) Plaintiff testified that she also takes Vicodin and Naproxen, which were recently prescribed by a pain specialist. Plaintiff testified that she took no medication before seeing a pain specialist and had just lived with the pain. (Tr. 119-20.)

Plaintiff testified that she has also suffered from anxiety for about three or four years. She gets nervous and has difficulty concentrating. Plaintiff testified that her anxiety arose when she was out in public and she worried whether she would fall or be able to find a place to sit, which made people look at her funny, which in turn made her feel inadequate. Plaintiff testified that she stopped going out in public. (Tr. 121-22.) Plaintiff testified that she has also suffered from depression for many years and was finally able to begin treatment for both her depression and anxiety when Medicaid started a few months prior. (Tr. 123.) Plaintiff testified to having feelings of guilt and worthlessness because she cannot get up and take care of herself or take care

of her grandchildren.  (Tr. 141.)  Plaintiff testified that her psychiatrist recently increased her dosage of Valium because she was on the verge of a nervous breakdown.  (Tr. 154-55.)

Plaintiff testified that she hears voices and takes Risperidone for the condition.  (Tr. 128.) Plaintiff testified that the voices scare her and she locks herself in the bathroom.  (Tr. 141-42.) Plaintiff testified that she thought at first that she heard her dad's voice, but then thinks at times that the voices are of those who took her body and gave her the body she presently has because her body was not like this before.  Plaintiff testified that the voices tell her that if she does not like this body, they will kill her and make it worse.  Plaintiff testified that she leaves her door unlocked on days she feels suicidal because she does not care on those days if the voices come to get her.  (Tr. 128-29.)

Plaintiff testified that she experiences blurred vision and dizziness as side effects of her medications.  (Tr. 127-28.)

Plaintiff testified that she is unable to concentrate and feels off task about sixty-five or seventy percent of the day.  (Tr. 142.)  Plaintiff testified that she can stand and walk up to seven minutes, which is from her doorway to her neighbor's and then back.  Plaintiff testified that she needs to stop and lean after such time because of pain and numbness in her back and legs.  (Tr. 143-44, 147.)  Plaintiff testified that she can sit for half an hour.  Plaintiff lies down for a few minutes twenty to thirty times day to relieve the pressure from her back.  (Tr. 144-45.)  Plaintiff testified that she also has difficulty bending and has days when she is unable to bend.  Plaintiff has difficulty with personal care and hygiene because of these limitations and is trying to obtain home healthcare.  (Tr. 146-47.)

Plaintiff testified that she used marijuana as a teenager but never used any other illegal drug, including methamphetamine.  (Tr. 113, 131.)

As to her daily activities, plaintiff testified that she does not set an alarm and wakes up whenever she wakes up. She then gets a soda from the refrigerator, takes medication, and eats breakfast. Plaintiff testified that she tries to keep everything near her so that she does not have to make many trips to get the things she needs, whether it be from the refrigerator or microwave, etc. Plaintiff testified that she does not do much during the day – she lies down, watches television, and pets her cats. (Tr. 148-49.)

Plaintiff testified that she does not have a driver's license and does not travel far distances because of pain. Plaintiff is able to get around on a scooter, which was donated to her because of her disability. Plaintiff eats fast food or lunch meat because she has no cooking facility in her apartment and cannot stand long enough to cook. Plaintiff uses a rolling chair to move around while doing housework. (Tr. 131-32, 144.) Her daughter helps her change the cats' litter box. (Tr. 133-34.)

C.   Medical Records Dated September 2011 through April 20, 2012

On September 9, 2011, plaintiff reported to Dr. Sultan that the epidural injections had not helped, and she was starting to experience additional pain. Plaintiff rated her current pain at a level eight. Plaintiff also complained of intermittent numbness and tingling in her legs and feet bilaterally. Plaintiff was noted to be using a walker. Examination showed mild to severe tenderness about the lumbosacral spine. Plaintiff was instructed to continue with a home exercise program, and Keppra was prescribed for nerve pain. (Tr. 641-45.)

Plaintiff visited Dr. Oruwari on September 22, 2011, and reported that the voices she hears scare her and tell her that they will kill her. Plaintiff reported that she does not go anywhere. Mental status examination showed plaintiff to be cooperative but withdrawn. Plaintiff had poor eye contact and was emotional and tearful. Plaintiff's mood and affect were noted to be depressed and anxious. Dr. Oruwari continued in his diagnoses of major depressive

disorder and pain disorder as well as with the GAF score of 45. Plaintiff was instructed to increase her dosage of Risperidone and to continue with Cymbalta and Diazepam. (Tr. 597.)

Plaintiff visited Dr. Sultan on October 11, 2011, and reported that her medications were helping, but she continued to have pain radiating from the low back to the hips and legs. Plaintiff expressed a fear of falling and reported having difficulty standing for very long. Plaintiff reported not being able to sleep more than three or four hours at a time. Examination showed plaintiff to have a moderate to severe antalgic gait. Plaintiff used a walker. Moderate tenderness was noted about the thoracic and lumbar spine. Plaintiff's dosages of hydrocodone and Keppra were increased, and plaintiff was instructed to continue with her other medications as prescribed. (Tr. 636-40.)

Plaintiff underwent a consultative physical examination on November 4, 2011, for disability determinations. Plaintiff complained of constant aching and burning back pain with numbness in the back and hips. Plaintiff's treatment history was noted as well as her past diagnoses of anxiety, depression, insomnia, back pain, arthritis, bulging disc, shortness of breath, and obesity. Plaintiff's current medications were noted to include Risperdal, Lorcet Plus, Valium, Lasix, Naproxen, Keppra, and Cymbalta. Plaintiff denied any alcohol or drug use. Physical examination showed weak reflexes and pitting edema about the ankles. Muscle tone and mass were normal. Leg raises were noted to be negative. Plaintiff was able to walk on her heels but had difficulty walking on her tiptoes because of back pain. Plaintiff could tandem walk but was noted to walk slowly. Dr. Matthew Karshner noted plaintiff to do a poor job of hopping for fear of back pain. Pain behaviors were noted to be present. Plaintiff had limited range of motion, but Dr. Karshner noted her to be inhibited somewhat by a significant fear of causing pain. Dr. Karshner diagnosed plaintiff with morbid obesity; "axis I/II issues, contributing to

- 14 -

perception and complaints of pain"; and degenerative joint disease of the lumbar spine. (Tr. 563-68.)

On that same date, November 4, 2011, Dr. Karshner completed a Medical Source Statement (MSS) of Ability to do Work-Related Activities in which he opined that plaintiff could occasionally lift up to twenty pounds and carry up to ten pounds; sit for thirty minutes at one time and for a total of five hours in an eight-hour workday; stand for thirty minutes at one time and for a total of four hours in an eight-hour workday; and walk for twenty minutes at a time and for a total of three hours in an eight-hour workday. Dr. Karshner reported that use of a walker was medically necessary in order for plaintiff to walk farther than twenty feet and that she could not carry small objects while using a walker. Dr. Karshner further opined that plaintiff should never push and/or pull; could frequently reach; and could continuously handle, finger, and feel. Dr. Karshner opined that plaintiff could occasionally climb stairs and ramps but should never balance, stoop, kneel, crouch, crawl, or climb ladders or scaffolds. Dr. Karshner opined that plaintiff should never be exposed to unprotected heights or operate a motor vehicle, and could have occasional exposure to moving mechanical parts, humidity and wetness, pulmonary irritants, and extreme cold and heat. Finally, Dr. Karshner opined that plaintiff had difficulty with personal hygiene and could not perform activities like shopping, ambulate without use of an assistive device, and climb a few steps at a reasonable pace with use of a single handrail. (Tr. 569-74.)

Plaintiff returned to Dr. Sultan on November 7, 2011, who decreased plaintiff's dosage of Keppra because of dizziness. Plaintiff was prescribed Gabitril and was instructed to continue with her other medications as prescribed. Plaintiff underwent a third epidural injection on November 10. (Tr. 627-35.)

On November 8, 2011, plaintiff underwent a consultative psychological evaluation for disability determinations. Thomas J. Spencer, Psy.D., noted plaintiff's report of physical complaints and observed plaintiff to be near tears while speaking. Plaintiff reported that she began seeing a psychiatrist one year prior when she was approved for Medicaid. Plaintiff also reported seeing a pain management specialist and her primary care physician. Plaintiff reported having been depressed for years and having recurrent thoughts of suicide. Plaintiff reported that she locks herself in the bathroom when people come to her house because she is scared. Plaintiff expressed a fear of the "people who made [her] like this" and spoke of demons. Plaintiff reported hearing voices and that they tell her that people are coming to get her and want to kill her. Plaintiff reported feeling hopeless and helpless and having no interest in anything she enjoys. Plaintiff reported being forgetful and having poor concentration and attention. Plaintiff denied any drug or alcohol abuse. As to her daily activities, plaintiff reported that she sleeps on and off, watches television, microwaves her meals, and cares for her three cats. Mental status examination showed plaintiff's speech to be pressured and her eye contact to be fair. Plaintiff looked to be in physical distress and was fidgety and restless during the evaluation. Dr. Spencer noted plaintiff to be cooperative, but her insight and judgment were questionable. Plaintiff described her mood as "okay," but Dr. Spencer noted her to be anxious and dysphoric. Plaintiff's long-term memory appeared unimpaired. Plaintiff could complete simple arithmetic. The Minnesota Multiphasic Personality Inventory placed plaintiff in a psychiatric population reflecting persons who are depressed, agitated, restless, and nervous, and who worry excessively and spend a lot of time anticipating events before they occur. Testing for executive functioning showed plaintiff to score one-to-three standard deviations beyond the mean. Upon conclusion of the evaluation, Dr. Spencer diagnosed plaintiff with major depressive disorder, recurrent, severe

with psychotic features; and anxiety disorder not otherwise specified. Post-traumatic stress disorder was to be ruled out. Dr. Spencer assigned a GAF score of 45-50. (Tr. 576-80.)

In a Mental MSS completed that same date, November 8, 2011, Dr. Spencer opined that plaintiff was markedly limited in her ability to make judgments on simple work-related decisions; to understand, remember, and carry out complex instructions; to make judgments on complex work-related decisions; and to respond appropriately to usual work situations and to changes in a routine work setting. Dr. Spencer further opined that plaintiff was moderately limited in her ability to understand, remember, and carry out simple instructions; and in her ability to interact appropriately with the public, supervisors, and coworkers. (Tr. 584-86.)

On November 17, 2011, plaintiff visited Dr. Oruwari and was continued in her GAF score of 45 and her diagnoses of major depressive disorder and pain disorder. No changes were made to her treatment regimen. (Tr. 596.)

Plaintiff returned to Dr. Sultan on December 8, 2011, and reported that the recent injection did not help and that she continued to have pain down her leg. Plaintiff was noted to walk with a cane and to have a moderate to severe antalgic gait. Mild to moderate tenderness was noted about the thoracic and lumbar spine. Plaintiff's dosage of Gabitril was increased. (Tr. 622-26.)

Urine drug screening dated December 8, 2011, yielded negative results for amphetamine. (Tr. 600.)

On January 9, 2012, plaintiff reported to Dr. Sultan that her medications were helping a little more, but she was experiencing more pain in her legs. Plaintiff rated her current pain at a level nine. Plaintiff walked with a cane. Mild tenderness was noted about the lumbar spine. Flexeril was prescribed for muscle spasm. (Tr. 617-21.)

Plaintiff visited Dr. Naushad on February 8, 2012, for another lumbar epidural steroid injection. Plaintiff's medications were also refilled. (Tr. 613-16.)

Plaintiff returned to Dr. Oruwari on February 16, 2012, and reported the voices to have worsened. Plaintiff also reported having episodes of confrontation and aggression. It was noted that plaintiff had run out of Valium. Mental status examination showed plaintiff's cooperation to be good and her speech normal. Plaintiff had poor eye contact. Plaintiff's thought process was noted to be logical and goal directed. Dr. Oruwari noted plaintiff's mood and affect to be depressed, and plaintiff was noted to be emotional and tearful. Plaintiff was continued in her diagnoses of major depressive disorder and pain disorder as well as her GAF score of 45. Dr. Oruwari instructed plaintiff to discontinue Risperidone and to continue with Cymbalta. Abilify and Diazepam were prescribed. (Tr. 595.)

Plaintiff visited Dr. Sultan on March 8, 2012, and reported that her last injection helped with the pain for one day, and then the pain returned. Plaintiff rated her current pain to be at a level seven. Plaintiff was noted to use a cane and to walk with a moderate antalgic gait. Moderate tenderness was noted about the lumbosacral spine. Plaintiff was continued on her current treatment regimen. (Tr. 608-12.)

Urine drug screening dated March 8, 2012, yielded negative results for amphetamine. (Tr. 599.)

On April 5, 2012, Dr. Sultan noted plaintiff to continue to have mild to moderate tenderness about the lumbosacral spine. Plaintiff continued to walk with a cane. Dr. Sultan prescribed Tramadol for breakthrough pain, and plaintiff was continued on Flexeril, Gabitril, and Vicodin. (Tr. 603-07.)

D.     Supplemental Administrative Hearing Held on April 20, 2012

The ALJ held a supplemental hearing on April 20, 2012, at which testimony was adduced from plaintiff as well as from medical, psychological, and vocational experts.

1.  *Testimony of Medical Expert*

Testimony was adduced first from Dr. Anne Edith Winkler, a board certified physician in internal medicine and rheumatology, who testified as a medical expert in response to questions posed by the ALJ and counsel.

Dr. Winkler testified that her review of the medical records shows plaintiff to have degenerative disc disease of the lumbar spine, which was noted on an x-ray to be mild but indicated by Dr. Nashaud to be moderate.  Dr. Winkler also testified that plaintiff had problems with obesity and had complaints of edema about the lower extremities, but the edema did not appear to be an ongoing problem.  Dr. Winkler opined that plaintiff's impairments did not meet or equal a listed impairment.  (Tr. 39-40.)

Dr. Winkler opined that, based on the medical record, plaintiff was limited to lifting and carrying twenty pounds occasionally and ten pounds frequently; to standing and/or walking four hours total in an eight-hour workday; and to have no limits in sitting.  Dr. Winkler opined that plaintiff should never climb ladders, ropes, or scaffolds, and should only occasionally engage in all other postural activities.  Dr. Winkler opined that plaintiff had no manipulative, visual, or communicative limitations, and was environmentally limited only to avoidance of unprotected heights.  (Tr. 41.)

Dr. Winkler testified that there was no medical evidence of a neurological impairment and no medical data indicating the need for a walker.  (Tr. 43.)

2.  *Testimony of Psychological Expert*

James Reid, a licensed clinical psychologist, testified as a psychological expert in response to questions posed by the ALJ and counsel.  Before providing testimony, Dr. Reid

asked plaintiff as to when she last used methamphetamine, to which plaintiff responded that she had never used the drug. (Tr. 47.)

Dr. Reid testified that his review of the medical record shows plaintiff to have been diagnosed with depressive disorders, anxiety disorders, and somatoform disorders – such as major depressive disorder, severe; major depressive disorder with psychotic features; and pain disorder with both medical and psychological features. Dr. Reid testified that, given plaintiff's clear diagnosis of a somatoform disorder, the record was not clear as to whether plaintiff had to have pain in order to get narcotic medication, leading to a possible issue under Listing 12.07, which addresses somatoform disorders . (Tr. 48-49.)

With respect to plaintiff's depression and anxiety disorders, Dr. Reid questioned whether they were substance-induced, noting "the problem" to be a physician assistant's medical note wherein it was reported that plaintiff was an "IV meth user for a very long time." Dr. Reid also noted the positive methamphetamine drug screening when plaintiff began the pain management program. (Tr. 48-49.)[4] Dr. Reid opined that the use of this drug coupled with taking narcotic pain medications would cause auditory hallucinations, paranoia, and periods of anxiety. (Tr. 49.) Dr. Reid testified that given her diagnosis of severe major depression with psychotic features, plaintiff would meet the criteria of Listing 12.09 (Substance Addiction Disorders) as evaluated under Listing 12.04 (Affective Disorders/Depressive Syndrome). Dr. Reid opined, however, that the circumstance of meeting this listed impairment was because of polysubstance use. (Tr. 50-51.)[5] Dr. Reid opined that it would take nine months to a year for someone to become sober after using methamphetamine given that it "is a debilitating substance that really does take its toll both physically and psychologically on the . . . individual." (Tr. 55.)

---

[4] Plaintiff audibly responded "No" and "That's not true" to this testimony. (Tr. 48, 49.)
[5] Plaintiff again audibly responded "Oh, my" and "Never, no" to this testimony. (Tr. 51.)

Dr. Reid opined that plaintiff's current use of home healthcare to assist with activities of daily living would indicate such activities to be markedly impaired. (Tr. 53.)[6] Dr. Reid also opined that plaintiff was markedly limited in her ability to maintain social functioning and in her ability to maintain concentration, persistence, or pace. (Tr. 54-55.) Dr. Reid opined, however, that a person who "cleaned up" and got off of methamphetamine would have mild impairments in activities of daily living; moderate impairments in social functioning; and mild impairments in concentration, persistence, or pace. (Tr. 55-56.)

Dr. Reid opined that a longtime user of methamphetamine would require some kind of treatment to end their addiction. Dr. Reid expressed concern that plaintiff's current use of narcotics, including opiates and Diazepam, may exhibit a switch from one addiction to another. He testified that even if plaintiff were to stop using methamphetamine, it was likely that she would become addicted to the narcotics and engage in narcotic abuse, demonstrating a need for a comprehensive drug treatment program. Dr. Reid also expressed concern that plaintiff was not being honest with her psychiatrist given that she told him that she never had any problems with drugs. (Tr. 59-60.)

3.    *Plaintiff's Testimony*

Plaintiff testified at the supplemental hearing in response to questions posed by the ALJ and counsel.

Plaintiff testified that she has never used and has never been a "long time user." Plaintiff testified that she questioned the positive drug test at the pain clinic and was told that she could be tested again, but the clinic did not feel the need to do so. Plaintiff testified that she has not had

---

[6] The record contains an unsigned, undated document from Missouri's Division of Senior and Disability Services that provides for plaintiff to receive services nineteen days a month for assistance with dressing, grooming, bathing, meal preparation, some chores, and transportation

any positive drug tests since that time, and that the information in the record is false. Plaintiff testified that she does not take her current medications to "replace something" since she never took anything to begin with. Plaintiff testified that she does not even like to take her current medications because they upset her stomach and make her dizzy. (Tr. 62-63.)

Plaintiff testified that her physical and mental limitations have not improved since the last hearing in August 2011. (Tr. 68.)

Plaintiff testified that her psychiatrist recently changed her medication to Abilify and Cymbalta and that the voices have subdued some since the previous hearing. Plaintiff testified that she continues to have symptoms of major depression and severe anxiety and does not feel adequate to do anything or go out in public. Plaintiff testified that she went out for Easter dinner recently but had a difficult time. (Tr. 66.)

Plaintiff testified that she currently uses a walker because of pain and because of her need to sit down. Plaintiff testified that the walker was not prescribed by any doctor and no one told her to use it, but she could not walk without a walker or a cane. (Tr. 69-70.) Plaintiff testified that a certified nurse's assistant comes to her home four days a week to help her shower, prepare light meals, and clean. (Tr. 67.)

4.      *Testimony of Vocational Expert*

Jeffrey F. Magrowski, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

The ALJ asked Mr. Magrowski to assume an individual who could

perform light work, can lift 20 pounds occasionally, 10 frequent, stand walk four hours out of eight, sit: no limitations on sitting. . . . This individual can climb stairs and ramps occasionally, stoop, kneel, crouch, crawl occasionally. Never climb ropes, ladders, scaffolds, must avoid hazards of heights, and must avoid concentrated exposure to extreme cold. This individual can understand remember

for shopping and errands. (Tr. 651.)

and carry out at least simple instructions and non-detailed tasks, but will not be able to maintain concentration and attention for two hour segments over an eight hour period, can respond appropriately to supervisors and coworkers in a task oriented setting where contact with others is casual and infrequent, can adapt to routine simple work changes, could not perform work at a normal pace without production quotas.

(Tr. 83.) Mr. Magrowski testified that such a person could not perform any work without accommodations. (Id.)

The ALJ then asked Mr. Magrowski to assume an individual who continued to be limited to light work,

can lift 20 pounds occasionally, 10 frequent, stand walk four hours out of eight, but must have a sit stand option at the work site with the ability to change positions frequently. So they could walk for a total of eight hours, but they must have a sit stand option at the work site.

. . .

We're talking understand, remember, carry out simple instructions, non-detailed tasks, maintain concentration and attention for two hour segments over [an] eight hour period, demonstrate adequate judgment to make simple work related decisions, respond appropriately to supervisors in a task oriented setting where contact with coworkers and others is casual and infrequent, adapt to routine simple work changes, can perform work at a normal pace without production quotas.

(Tr. 83-84.) Mr. Magrowski testified that such a person could perform some work as a mail clerk, of which 2,000 such jobs exist in the State of Missouri and 100,000 nationally; and a laundry worker, of which 1,000 such jobs exist in the State of Missouri and 7,000 nationally. (Tr. 85.)

D.     Medical Records Dated April 26, 2012

Plaintiff visited Dr. Sunil Chand on April 26, 2012, who noted that plaintiff was being followed by the pain clinic. Plaintiff reported her current pain to be at a level seven to eight, but that the pain is at a level three with pain medication. Plaintiff reported the pain to be worsening

and that she cannot bend over, walk, stand, or sit down. Physical examination was normal. Dr. Chand prescribed a walker for plaintiff. (Tr. 646-47.)

E.     Report of Cooperative Disability Investigations Unit

Upon request for investigation into plaintiff's activities and functioning in relation to her applications for disability, Detective Mark Grobelny of the Cooperative Disability Investigations Unit conducted a three-hour surveillance of plaintiff on May 24, 2012, near her home in Leadington, Missouri.[7] (Tr. 656-62.) Over the course of this surveillance, Detective Grobelny observed plaintiff to exit her home on four occasions, with each occasion lasting only a few minutes in duration. (Tr. 658-60.) Detective Grobelny summarized his observations as follows:

> When first observed, Ms. Bailey did not appear to have any difficulty walking short distances, standing, reaching, or lifting/carrying objects. Her strides were short but even and her posture erect. She also demonstrated a wide range of motion with both arms and dexterity in both hands. She never appeared fatigued or short of breath, nor did she ever appear to be experiencing any obvious pain or discomfort. As the surveillance continued and she appeared to become more concerned with my presence, her use of assistive devices progressed from none to a cane to a walker and her physical abilities appeared to become more limited. She began walking with a limp and at one point appeared to stop to catch her breath while leaning on the walker. The cane had been retrieved from inside the apartment, but the walker was removed from atop a pile of personal property stacked outside her apartment and had apparently been there for some time, based on the other items entangled within its tubular structure. Once I exposed myself in a traffic safety vest and began conducting what appeared to be highway-related business, Ms. Bailey's condition appeared to improve. She no longer used either assistive device to ambulate and the limp was no longer evident. Based on her constant interactions with at least three other residents at the apartment building, she did not appear to be uncomfortable around others or to have difficulty communicating. She appeared to be lucid and alert throughout the surveillance.

(Tr. 660-61.)

---

[7] Detective Grobelny positioned his vehicle on a roadway near plaintiff's home, set out traffic cones, wore an orange safety vest, and walked along the roadway with a clipboard to give the appearance of taking traffic notes.

## III.  Evidence Submitted to the Appeals Council[8]

On July 12, 2012, Dr. Chand completed a Statement for Disabled License Plates for the Missouri Department of Revenue, Motor Vehicle Bureau, certifying that plaintiff had a temporary disability of 151-180 days on account of her inability to ambulate or walk without the use of an assistive device.  (Tr. 406.)

## IV.  The ALJ's Decision

The ALJ found plaintiff to meet the insured status requirements of the Social Security Act through June 30, 2012.  The ALJ found that plaintiff had not engaged in substantial gainful activity since July 29, 2009, the alleged onset date of disability.   The ALJ found plaintiff's degenerative disc disease of the lumbar spine, major depressive disorder, anxiety disorder, and post-traumatic stress disorder to be severe impairments and that, when coupled with plaintiff's substance use disorder, they met Listings 12.04 and 12.09 of the Listings of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 15-16.)  The ALJ further found that, in the absence of plaintiff's substance use, she would continue to have severe impairments but that they would not meet or medically equal a listed impairment.  (Tr. 18.)  The ALJ determined that, if plaintiff stopped the substance use, she would have the RFC to perform light work as defined by the Regulations,[9] with the following exceptions:

---

[8] In determining plaintiff's request to review the ALJ's decision, the Appeals Council considered additional evidence that was not before the ALJ at the time of his decision.  The Court must consider this evidence in determining whether the ALJ's decision was supported by substantial evidence.  Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994).

[9] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §§ 404.1567(b), 416.967(b).

she must have a sit, stand option with the ability to change positions frequently. She can occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl. She must avoid concentrated exposure to extreme cold and hazards of heights. She can never climb ropes, ladders and scaffolds. She can understand, remember, and carry out simple instructions and non-detailed tasks. She can maintain concentration and attention for two-hour segments over an eight-hour period. She can demonstrate adequate judgment to make simple, work-related decisions. She can respond appropriately to supervisors in a task-oriented setting where contact with coworkers and others is casual and infrequent. She can adapt to routine, simple work changes. She can perform work at a normal pace without production guidelines.

(Tr. 19.) The ALJ found this RFC to preclude plaintiff from performing her past relevant work. However, upon consideration of this RFC coupled with plaintiff's age, education, and work experience, the ALJ found that vocational expert testimony supported a finding that, in the absence of substance use, plaintiff could perform other work as it exists in significant numbers in the national economy, and specifically, as a mail clerk and laundry worker. The ALJ thus found that plaintiff would not be disabled if she stopped her substance use. (Tr. 24-26.)

## V. Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. If claimant's impairment(s) meets or equals one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, a finding of "disabled" is appropriate.

In cases involving evidence of substance abuse, this initial disability determination must be based on substantial evidence of a claimant's limitations "without deductions for the assumed effects of substance abuse disorders." Brueggemann v. Barnhart, 348 F.3d 689, 694 (8th Cir. 2011). If, upon consideration of all such limitations, the ALJ finds the claimant to be disabled, the ALJ must then consider which limitations would remain when the effects of substance abuse are absent. Id. at 694-95; 20 C.F.R. §§ 404.1535(a), 416.935(a). "An individual is not considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). The "key factor" is whether the claimant would continue to be found disabled if she stopping using drugs or alcohol. 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1). The claimant

bears the burden of proving that her substance abuse is not a contributing factor material to the claimed disability. Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002).

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes, 275 F.3d at 724. Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.     The credibility findings made by the ALJ.

2.     The plaintiff's vocational factors.

3.     The medical evidence from treating and consulting physicians.

4.     The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.     Any corroboration by third parties of the plaintiff's impairments.

6.     The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050

(8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff first challenges the ALJ's treatment of the evidence regarding plaintiff's alleged substance use. Plaintiff contends that the record does not support the ALJ's finding that she had a substance use disorder of any kind and thus that the ALJ's finding that she experienced limitations of listing-level severity must result in a finding of disability. Plaintiff next argues that, even if the record were to demonstrate previous substance use, objective medical evidence demonstrates that her abstinence from such use has been of such duration that she no longer experiences its effects. Plaintiff contends that, therefore, her current limitations – which the ALJ found to be disabling – exist in the absence of substance use, thus mandating a finding of disability. Finally, plaintiff challenges the ALJ's failure to address her somatoform pain disorder, arguing that the failure to consider this impairment at Step 2 of the sequential evaluation resulted in a flawed analysis regarding the effects of all of plaintiff's impairments when considered in combination and an RFC that is unsupported by substantial evidence.

The Court addresses each of these claims in turn.

A.    Evidence of Substance Use

"It is the ALJ's task to resolve conflicts in the evidence[.]" Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006). The ALJ's decision will not be disturbed simply because this Court may have reached a different conclusion had it been the fact finder in the first instance. Id. The

Court may not "substitute its opinion for the ALJ's, who is in a better position to . . . resolve conflicts in evidence." Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007). Because the resolution of conflicting evidence is within the province of the ALJ, he does not err where his finding of fact is more consistent with one line of evidence than another. Brachtel v. Apfel, 132 F.3d 417, 420 (8th Cir. 1997).

Here, the record before the ALJ contained notes from a healthcare provider that results from a May 2011 UDS showed the presence of methamphetamine, as well as evidence that plaintiff advised another healthcare provider in June 2010 that she was a longtime user of the drug. The ALJ also had before him expert testimony that plaintiff exhibited signs and symptoms consistent with methamphetamine use. Although the record also contained conflicting evidence consisting of plaintiff's testimony that she never used the drug and UDS tests that consistently yielded negative results for amphetamine beginning in July 2011, it is the duty of the ALJ to resolve conflicts in the record. Because the record contains substantial evidence showing plaintiff to have used methamphetamine, the ALJ did not err in making a factual finding consistent with this evidence, despite the existence of other evidence that may support a contrary finding.

B.    Effects of Substance Use

In his written decision, the ALJ found that the limitations caused by the effects of all of plaintiff's impairments, including the effects of substance use, would result in a finding of disability inasmuch as such limitations met the criteria for Listing 12.09 (Substance Addiction Disorders) as evaluated under Listing 12.04 (Affective Disorders/Depressive Syndrome). (Tr. 16-18.) The ALJ further found that, in the absence of substance use, the limitations caused by plaintiff's impairments would no longer meet or equal a listed impairment, and that her resulting RFC would not preclude the performance of work as it exists in significant numbers in the

national economy. (Tr. 18-25.) As noted above, plaintiff contends that she never used methamphetamine. Nevertheless, she argues here that even if she used methamphetamine in the past, the record shows her not to have used the substance since at least July 2011, and thus that the disabling limitations she was found to experience at the time of the supplemental hearing in April 2012 could not have been attributable to her use of the drug. Plaintiff argues that because these disabling limitations could not be caused by her use of methamphetamine, they can only be caused by her remaining impairments. Therefore, plaintiff argues, her past methamphetamine use cannot be a contributing factor material to the ALJ's finding of disability. For the following reasons, plaintiff's claim fails.

As noted by the ALJ, the evidence of record shows that plaintiff tested positive for the presence of methamphetamine in May 2011. Plaintiff was informed of this test result in July 2011 and was cautioned against continued use of the drug given her contract to take narcotic medication. Subsequent UDS tests in July 2011, as well as in December 2011 and March 2012, showed negative results for amphetamine. Dr. Reid provided expert testimony, however, that it takes nine months to a year for someone to become sober after using methamphetamine given the physical and psychological toll that the drug takes on a person. Notably, there was no evidence before the ALJ that fell outside of this nine-to-twelve-month range after plaintiff was cautioned against continued use of methamphetamine. Additionally, the evidence before the ALJ showed that the listing level limitations plaintiff experienced during this period were consistent with the effects of methamphetamine use. As such, although evidence may support a finding that plaintiff stopped using methamphetamine prior to the supplemental hearing in April 2012, the record shows her to have continued to experience its effects, which is consistent with the expert's testimony that the effects of long-term methamphetamine use would remain for nine-to-twelve months.

Accordingly, plaintiff's claim that the marked limitations she experienced at the time of the supplemental hearing in April 2012 could not be attributed to past methamphetamine use and were the result of only her non-drug use impairments is belied by the evidence of record, and the claim fails.

C.    Somatoform Pain Disorder

Plaintiff claims that the ALJ erred by failing to find her somatoform pain disorder to be a severe impairment at Step 2 of the sequential evaluation. Plaintiff contends that this error led to the ALJ's failure to consider the effects of this mental disorder on plaintiff's perception of pain and, further, resulted in a faulty RFC assessment in that the ALJ failed to consider the combined effects of all of her impairments. Plaintiff's argument has merit.

According to the DSM-IV-TR, the diagnostic criteria for pain disorder are: 1) pain in one or more anatomical sites of sufficient severity to warrant clinical attention; 2) the pain causes clinically significant distress or impairment in social, occupational, or other important areas of functioning; 3) psychological factors are judged to have an important role in the onset, severity, exacerbation, or maintenance of the pain; 4) the symptom or deficit is not intentionally produced or feigned; and 5) the pain is not better accounted for by a mood , anxiety, or psychotic disorder. DSM-IV-TR at 498. Pain disorders associated with both psychological and medical factors are those in which both psychological factors and a general medical condition are "judged to have important roles in the onset, severity, exacerbation, or maintenance of the pain." Id. at 499.

Pain disorder is within the class of Somatoform Disorders. DSM-IV-TR at 485.

The common feature of the Somatoform Disorders is the presence of physical symptoms that suggest a general medical condition . . . and are not fully explained by a general medical condition, by the direct effects of a substance, or by another mental disorder . . . . The symptoms must cause clinically significant distress or impairment in social, occupational, or other areas of functioning. . . . [T]he physical symptoms are not intentional (i.e., under voluntary control)[, and] there

is no diagnosable general medical condition to fully account for the physical symptoms.

Id.  The Commissioner defines Somatoform Disorders as "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms."  20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.07.  A somatoform disorder is a nonexertional mental impairment that may affect a claimant's ability to perform the physical requirements of work.  See Sanders v. Sullivan, 983 F.2d 822, 823-24 (8th Cir. 1992); Webber v. Secretary of Health & Human Servs., 784 F.2d 293, 299 (8th Cir. 1986) (discussing hypochondriasis, which is identified as a somatoform disorder at DSM-IV-TR at 485); Carraher v. Sullivan, 796 F. Supp. 1207, 1212-13 (S.D. Iowa 1992).

Plaintiff was first diagnosed with pain disorder in May 2011, notably with associated psychological and medical factors.  She thereafter received consistent psychiatric diagnoses of pain disorder on no less than five occasions, and Dr. Reid acknowledged plaintiff's clear diagnosis of somatoform disorder during his testimony in April 2012.  Other than acknowledging Dr. Reid's testimony in this regard (Tr. 16), the ALJ made no mention of plaintiff's diagnosed mental impairment of pain disorder in his written decision, nor did he address its effects.[10]

The ALJ discussed plaintiff's complaints of significant pain but found them to be inconsistent with the medical evidence of record that showed only mild to moderate degenerative disease, relatively normal physical examinations, and clinical testing that showed minimal limitations.  (Tr. 21-22.)  What the ALJ failed to appreciate, however, is that plaintiff's clinically

---

[10] Curiously, the ALJ listed major depressive disorder, anxiety disorder, and post-traumatic stress disorder as plaintiff's diagnosed mental impairments (Tr. 23) but did not include pain disorder despite plaintiff being repeatedly diagnosed with the impairment by a psychiatrist, and with such diagnosis confirmed by the psychological expert at the administrative hearing.  The undersigned also finds it curious that, in her Brief in Support of the Answer (ECF #21), the Commissioner likewise makes no mention of this diagnosed impairment and is silent with respect plaintiff's instant claim that the ALJ erred when he failed to properly consider the impairment in his

diagnosed somatoform pain disorder causes her to exaggerate her physical problems in her mind beyond what the medical data indicate. See Easter v. Bowen, 867 F.2d 1128, 1130 (8th Cir. 1989). To discount plaintiff's somatic complaints of physical symptoms based on the lack of corroborating objective medical evidence "misses the point of her serious mental problem." Id. It cannot be said, therefore, that the ALJ adequately considered plaintiff's diagnosed mental impairment of somatoform pain disorder when he determined her severe impairments at Step 2 of the sequential analysis.

The ALJ's failure to adequately consider the impact of plaintiff's somatoform pain disorder likewise affected his credibility determination and RFC assessment. Although the ALJ expressly found that plaintiff's allegations were not credible, a primary reason given for discrediting plaintiff's complaints of pain – that is, the lack of objective medical evidence supporting the degree of symptoms alleged – is indicative of the mental impairment itself. Exaggeration of symptoms and lack of objective medical evidence supporting physical symptoms are not good reasons for discrediting subjective complaints of pain from a claimant diagnosed with a somatoform disorder. Tedford v. Colvin, No. C12-4076-LTS, 2013 WL 3338477, at *16 (N.D. Iowa July 2, 2013).

In addition, when assessing plaintiff's physical RFC, the ALJ accorded great weight to the opinion of Dr. Winkler, the medical expert who testified at the supplemental hearing. Dr. Winkler based her opinion on the objective medical evidence of record set out above that showed only mild to moderate degenerative disease, few demonstrated limitations on physical examination, and no evidence of a neurological deficit. (Tr. 22-23.) Dr. Winkler – and the ALJ in turn – considered purely organic bases in determining the extent to which plaintiff's physical ability to engage in work-related activities was limited. The extent to which plaintiff's physical

decision.

ability was subjectively affected by her pain disorder, however, was not considered. This is significant inasmuch as a somatoform disorder such as pain disorder can affect a claimant's physical ability to perform work. Webber, 784 F.2d at 299; Carraher, 796 F. Supp. at 1212-13.

In sum, the ALJ's Step 2 finding and credibility determination failed to consider the nature of plaintiff's diagnosed mental impairment of pain disorder, a somatoform disorder as defined in the DSM-IV-TR, and its impact on plaintiff's ability to perform the mental and physical requirements of work. Because the ALJ's RFC determination must be based on plaintiff's ability to perform the requirements of work "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world," McCoy v. Astrue, 648 F.3d 605, 617 (8th Cir. 2011) (internal quotation marks and citation omitted), it cannot be said that the ALJ's RFC assessment here is supported by substantial evidence on the record as a whole where he failed to consider a primary source of plaintiff's alleged disability. See also Easter, 867 F.2d at 1130 (noting that employers are concerned with an employee's "substantial capacity, psychological stability, and steady attendance[.]").

This matter will therefore be remanded so that plaintiff's medically determinable and diagnosed mental impairment of pain disorder can be taken into account at Step 2 of the sequential analysis; can be properly considered at Step 3 in determining whether this impairment, considered alone and in combination with plaintiff's other impairments, meets or medically equals a listed impairment, including Listing 12.07 – Somatoform Disorders; and can be properly taken into account at Step 4 in determining plaintiff's credibility and RFC, given its nature of producing physical symptoms and causing clinically significant distress or impairment in social, occupational, or other important areas of functioning. If necessary, the ALJ may obtain additional medical evidence and conduct another hearing to more fully develop the record

regarding plaintiff's pain disorder and its effect on her mental and physical ability to perform work.

Accordingly, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An appropriate judgment of remand will accompany this order.

**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this __29th__ day of September, 2015.